# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| READING HOSPITAL, *on behalf of itself and all others similarly situated*,<br><br>               Plaintiffs,<br><br>vs.<br><br>HILL-ROM HOLDINGS, INC., HILL-ROM COMPANY, INC., and HILL-ROM SERVICES, INC.<br><br>               Defendants. | CLASS ACTION COMPLAINT<br><br>Civil Action No.: _____<br><br><br>JURY TRIAL DEMANDED |

This action is brought by Plaintiff, on behalf of itself and others similarly situated, to prevent a serial monopolist and violator of the antitrust laws, Defendants Hill-Rom Holdings, Inc., and its wholly-owned subsidiaries Hill-Rom Company, Inc. and Hill-Rom Services, Inc. (collectively referred to herein as "Hill-Rom"), from destroying competition by engaging in a variety of anticompetitive practices.

## INTRODUCTION

1. Hill-Rom is the dominant supplier of hospital beds in the United States and a serial abuser of the antitrust laws. Over the past two decades, Hill-Rom has paid over half a billion dollars to customers and competitors for repeated, flagrant violations of the antitrust laws as it has aggressively sought to leverage its entrenched hospital bed monopoly through a variety of exclusionary and anticompetitive tactics. Hill-Rom, on or about January 1, 2013, began a systematic effort to exclude competition and sought to achieve its goal of excluding competition and competitors' products through a unitary scheme of coordinated tactics with a singular aim. Hill-Rom's conduct was and is unreasonably anticompetitive and thus unlawful.

2. The allegations herein parallel the claims alleged in *Linet Americas, Inc. v. Hill-Rom Holdings, Inc., et al.*, No. 1:21-CV-6890, 2023 WL 9119836 (N.D. Ill. Dec. 1, 2023).

3. The gravamen of this complaint is that Hill-Rom is foreclosing the distribution channel by which suppliers sell hospital beds and other medical equipment to health care providers through a series exclusionary tactics. Specifically, over the past decade and continuing today, Hill-Rom has used its market power to impose long-term, exclusive "Corporate Enterprise Agreements" and analogous exclusionary contracts ("CEAs") on hospital systems throughout the U.S. that prevent them and their constituent hospitals from contracting with other hospital bed suppliers.

2

4.      By unlawfully exploiting its monopoly power to exclude competition, Hill-Rom has foreclosed would-be rivals from being able to discipline Hill-Rom's monopoly power and pricing, and thereby Hill-Rom has been able to charge, and has charged, supracompetitive prices to Plaintiff and similarly situated hospitals for hospital beds.

## PARTIES

5.      Reading Hospital ("Reading") is a 697-bed hospital and home to many top-tier specialty care centers. Reading has been recognized as one of the country's top hospitals for overall clinical performance for many years. Reading is a Pennsylvania non-profit corporation, incorporated in 1869, with its principal place of business at 420 S. Fifth Avenue, West Reading, PA 19611. At all times relevant hereto, Reading purchased, *inter alia*, hospital beds directly from Hill-Rom.

6.      Hill-Rom Holdings, Inc. is a corporation formed and existing under the laws of the State of Indiana, with its principal place of business at 130 East Randolph Street, Suite 1000, Chicago, IL, 60601. Hill-Rom Holdings, through its direction and control of subsidiaries, is a worldwide manufacturer and supplier of medical technologies and related services for the health care industry, including the manufacture and sale of hospital beds to medical providers through interstate commerce. It regularly transacts business in the State of Pennsylvania and this judicial district, including through interstate commerce.

7.      Hill-Rom Company, Inc. is a wholly-owned subsidiary of Hill-Rom Holdings, Inc. and is a corporation formed and existing under the laws of the State of Indiana, with its principal place of business at 130 East Randolph Street, Suite 1000, Chicago, IL, 60601. Hill-Rom Company sells and distributes Hill-Rom products. Hill-Rom Company, Inc. regularly transacts business in and within the State of Pennsylvania and this judicial district, including

3

through interstate commerce.

8.     Hill-Rom Services, Inc. is a wholly-owned subsidiary of Hill-Rom Holdings, Inc., and is a corporation formed and existing under the laws of the State of Indiana, with its principal place of business at 130 East Randolph Street, Suite 1000, Chicago, IL, 60601. Hill-Rom Services controls licensing of Hill-Rom products. It regularly transacts business in the State of Pennsylvania and this judicial district, including through interstate commerce.

## JURISDICTION AND VENUE

9.     This court has subject matter jurisdiction pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), 28 U.S.C. §§ 1331 and 1337, and 28 U.S.C. § 1367(a). Plaintiff brings this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit, and reasonable attorney's fees for Hill-Rom's violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1–2), and Section 3 of the Clayton Act (15 U.S.C. § 14).

10.     This Court has personal jurisdiction over Hill-Rom pursuant to 28 U.S.C. § 1391 and Section 12 of the Clayton Act (15 U.S.C. § 22) because, *inter alia*, Hill-Rom (a) regularly does business in the State of Pennsylvania, and (b) maintains an office, place of business, and/or agency for transacting business in the State of Pennsylvania.

11.     Venue is proper in the United States District Court for the Eastern District of Pennsylvania, pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. § 1391(b) and (c) because Hill-Rom resides, transacts business, is found, and has agents in this district, and because a substantial portion of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in the Eastern District of Pennsylvania.

## RELEVANT MARKETS AND MARKET POWER

**The U.S. Hospital Bed Industry**

12.     The U.S. hospital bed industry is comprised of several different product segments. The largest segment is the standard hospital bed segment, which makes up the majority of the market with approximately 666,000 standard hospital beds ("Standard Hospital Beds") installed in U.S. hospitals.

13.     The second largest segment is the intensive care unit ("ICU") hospital bed segment, with roughly 86,000 beds ("ICU Beds") installed in U.S. hospitals.

14.     Birthing beds comprise a smaller segment of approximately 26,000 beds ("Birthing Beds") installed in U.S. hospitals.

15.     There are three relevant product markets in the relevant geographic market:  the Standard Hospital Bed market in the United States, the ICU Bed market in the United States, and the Birthing Bed market in the United States. Collectively, these three markets are the Relevant Markets, and these types of beds are the Relevant Products.[1]

**The Standard Hospital Bed Market**

16.     The market for Standard Hospital Beds is a distinct product market. Standard Hospital Beds, also referred to as universal beds or medical-surgical beds, are generic beds used throughout a hospital to care for the majority of admitted and non-critical patients. They feature a heavy metal frame and an adjustable mattress.

17.     The healthcare industry recognizes Standard Hospital Beds as a separate product

---

[1] Other affected markets, like the market for hospital bed accessories related to each of the types of beds identified above, may also exist. Plaintiff at this time is not seeking to recover for any damages in those accessory markets.

5

market.

18.     Standard Hospital Beds are priced as a distinct product, with a separate price point from other types of hospital beds and surfaces.

19.     Group purchasing organizations ("GPOs") and integrated delivery networks ("IDNs") are involved in contracting for or purchasing Standard Hospital Beds. GPOs and IDNs treat Standard Hospital Beds as a separate product category, and hospitals and vendors enter Standard Hospital Bed contracts that are separate from contracts for the sales of other types of beds.

20.     Hill-Rom also treats Standard Hospital Beds as a standalone product market, listing it as a separate category from other types of hospital bed products on its website and discussing it as a separate product category in public statements to investors and industry analysts.

21.     There are no reasonably interchangeable products with Standard Hospital Beds.

22.     There is no cross-elasticity of demand between Standard Hospital Beds and other products.

23.     In response to a small but significant non-transitory increase in price, customers would not substitute Standard Hospital Beds for other products such as ICU Beds or long-term care hospital beds because ICU Beds are much more expensive than Standard Hospital Beds and long-term care hospital beds do not have the functionality and features to care for patients in a critical care setting.

24.     The relevant geographic market for the sale of Standard Hospital Beds is the United States. U.S. hospital customers demand that suppliers have a local sales and service

organization in order to provide dedicated sales support, as well as in-service training, education, and clinical support specific to the U.S. health care industry. U.S. hospital customers also expect suppliers to provide service and maintenance for beds placed in U.S. facilities by trained technicians familiar with a specific manufacturer's equipment, all of which requires a physical presence in the country and specific knowledge of the U.S. market. In response to a small but significant non-transitory increase in price, customers would not look to purchase Standard Hospital beds directly from international suppliers because they rely on all of the aforementioned market necessities to keep hospital beds in safe working order over their long capital lifespan.

25.     The Standard Hospital Bed market in the U.S. is highly concentrated.

26.     Hill-Rom wields monopoly and market power in the Standard Hospital Bed market.

27.     Plaintiff is informed and believes that Hill-Rom controls a market share of at least 75% of Standard Hospital Beds installed in U.S. hospitals. There are approximately 666,000 Standard Hospital Beds installed in U.S. hospitals, and Hill-Rom has represented to investors in recent years that it possesses a "tremendous number of [the] existing installed base" of over 500,000 Standard Hospital Beds in the U.S.

28.     Hill-Rom itself has repeatedly boasted to investors that it enjoys a share of over 70% of the installed base in the Standard Hospital Bed category.

29.     The health care industry, including manufacturers, customers, and financial analysts, all recognize installed base, rather than annual sales, as the appropriate measure of market share.

30.     Installed base is the only appropriate measure of market power because the

7

Standard Hospital Bed market is mature, heavily penetrated, and characterized by episodic rather than smooth demand. Even though there are around 778,000 staffed beds in the Relevant Markets installed in U.S. hospitals, annual sales are typically less than 50,000 beds to 60,000 beds, or on the order of 7% of the overall installed base. But annual sales are extremely volatile and can spike in years when hospitals make large capital buys or decline steeply when capital budgets are tight.

31.     Market participants and industry experts use installed base to measure market share because it controls for the episodic nature of bed purchases and measures the durability of a given supplier's market power.

32.     Hill-Rom itself measures its market share by installed base, noting publicly the "inherent lumpiness" in the hospital bed business that can result in "big swings" quarter-to-quarter and year-to-year. This is the reason that Hill-Rom shares its installed base figures with investors, rather than its annual market share of bed sales.

33.     Even if Hill-Rom's market share is not measured by installed base, Hill-Rom also enjoys a market share of at least 64% of Standard Hospital Beds based on estimated annual market sales.

34.     Hill-Rom currently offers only one type of Standard Hospital Bed product—the Centrella bed—to customers for purchase.

35.     Hill-Rom manufactures Standard Hospital Beds and sells them to medical facilities in all 50 states, including this judicial district, through interstate commerce under supply agreements with its customers.

36.     After decades of Hill-Rom's dominance and anticompetitive conduct, there are now only two principal competitors to Hill-Rom in the Standard Hospital Bed market: Stryker

Corporation ("Stryker") and Linet. Each of these competitors sells at least one model of Standard Hospital Beds. The different models of Standard Hospital Beds made by each manufacturer are all close substitutes and can be used interchangeably.

**The Intensive Care Unit Bed Market**

37.     The market for ICU Beds (used in intensive care) is a distinct product market. ICU Beds require advanced functionality to care for patients in critical care condition. ICU Beds are electric beds that can be maneuvered in specific ways to relieve pressure and facilitate respiration and circulation. They are used in units where constant, close monitoring and support is provided to patients with severe and life-threatening conditions and injuries.

38.     The healthcare industry recognizes ICU Beds as a separate product market.

39.     ICU Beds are priced as a distinct product, with a separate price point from other types of hospital beds and surfaces.

40.     GPOs, IDNs, hospitals and other entities that are involved in contracting for or purchasing ICU Beds treat them as a separate product category, and hospitals and vendors enter into ICU bed contracts that are separate from contracts for the sales of other types of beds.

41.     Hill-Rom also treats ICU Beds as a standalone product market, listing "Intensive Care Unit" beds separately from other types of hospital bed products on its website and discussing ICU Beds as a separate product category in public statements to investors and industry analysts.

42.     There are no reasonably interchangeable products with ICU Beds.

43.     There is no cross-elasticity of demand between ICU Beds and other products.

44.     In response to a small but significant non-transitory increase in price, customers

would not substitute ICU Beds for other products such as Standard Hospital Beds or long-term care hospital beds because those other products do not have the necessary functionality and features to care for patients in a critical care setting.

45.     The relevant geographic market for the sale of ICU Beds is the United States. U.S. hospital customers demand that suppliers have a local sales and service organization in order to provide dedicated sales support, as well as in-service training, education, and clinical support specific to the U.S. health care industry. U.S. hospital customers also expect suppliers to provide service and maintenance for beds placed in U.S. facilities by trained technicians familiar with specific manufacturer's equipment, all of which requires a physical presence in the country and specific knowledge of the U.S. market. In response to a small but significant non-transitory increase in price, customers would not look to purchase ICU Beds directly from international suppliers because they rely on all of the aforementioned market necessities to keep hospital beds in safe working order over their long capital lifespan.

46.     The ICU Bed market is highly concentrated.

47.     Hill-Rom wields market power in the ICU Bed market.

48.     The installed base of ICU Beds in the U.S. is roughly 86,000 beds. Installed base, as explained above, is the relevant measure of market share in the hospital bed industry. Hill-Rom's estimated installed base of ICU Beds exceeds 70%.

49.     Even if Hill-Rom's market share is not measured by installed base, Hill-Rom also enjoys a market share of at least 75% of ICU Beds based on estimated annual market sales.

50.     Hill-Rom offers only one type of ICU Bed product to customers, its Progressa bed.

51.     Hill-Rom manufactures ICU Beds and sells them to medical facilities in all 50 states, including in this judicial district, through interstate commerce under supply agreements with its customers.

52.     After decades of Hill-Rom's dominance and anticompetitive conduct, there are now only two principal competitors to Hill-Rom in the ICU Beds market in the U.S.: Stryker and Linet. Each competitor sells one or more models of ICU Beds. The different models of ICU Beds made by different manufacturers are all close substitutes and can be used interchangeably.

**The Birthing Bed Market**

53.     The market for Birthing Beds is a distinct product market. Birthing Beds are used in hospital labor and delivery units to care for patients before, during, and potentially after giving birth. These electric beds typically feature an adjustable backrest, seat, and foot, and may accommodate birthing-specific features like foot and leg supports, handgrips, labor/squatting bars, drain pans, IV poles, and arm boards. Many birthing beds are designed to accommodate various birthing positions. Birthing beds are also referred to as labor and delivery (L&D) beds.

54.     The healthcare industry recognizes Birthing Beds as a separate product market.

55.     Birthing Beds are priced as a distinct product, with a separate price point from other types of hospital beds and surfaces.

56.     GPOs, IDNs, hospitals and other entities that are involved in contracting for or purchasing Birthing Beds treat them as a separate product category, and hospitals and vendors enter Birthing Bed contracts that are separate from contracts for the sales of other types of beds.

57.     Hill-Rom itself treats Birthing Beds as a standalone product market, listing "Labor & Delivery Postpartum" beds separately from other types of hospital bed products on its

website.

58.     There are no reasonably interchangeable products with Birthing Beds.

59.     There is no cross-elasticity of demand between Birthing Beds and other products.

60.     In response to a small but significant non-transitory increase in price, customers would not substitute Birthing Beds for other products such as Standard Hospital Beds, ICU Beds, or long-term care hospital beds because those other products do not have the specific functionality and features designed to allow laboring mothers to safely and comfortably deliver a baby.

61.     The relevant geographic market for the sale of Birthing Beds is the United States. U.S. hospital customers demand that suppliers have a local sales and service organization in order to provide dedicated sales support, as well as in-service training, education, and clinical support specific to the U.S. health care industry. U.S. hospital customers also expect suppliers to provide service and maintenance for beds placed in U.S. facilities by trained technicians familiar with specific manufacturer's equipment, all of which requires a physical presence in the country and specific knowledge of the U.S. market. In response to a small but significant non-transitory increase in price, customers would not look to purchase Birthing Beds directly from international suppliers because they rely on all of the aforementioned market necessities to keep hospital beds in safe working order over their long capital lifespan.

62.     The Birthing Beds market is highly concentrated.

63.     Hill-Rom wields market power in the Birthing Beds market.

12

64.     The installed base of Birthing Beds in the U.S. is roughly 26,000 beds. Installed base, as explained above, is the relevant measure of market share in the hospital bed industry. Hill-Rom's estimated installed base of Birthing Beds exceeds 70%.

65.     Even if Hill-Rom's market share is not measured by installed base, Hill-Rom also enjoys a market share of at least 74% of Birthing Beds based on estimated annual market sales.

66.     Hill-Rom's Birthing Bed is the Affinity 4 bed.

67.     Hill-Rom manufactures Birthing Beds and sells them to medical facilities in all 50 states, including in this judicial district, through interstate commerce under supply agreements with its customers.

68.     There are now only two remaining competitors to Hill-Rom in the Birthing Beds market in the U.S: Stryker and Linet. Each of the remaining competitors sells one or more models of Birthing Beds. The different models of Birthing Beds made by different manufacturers are all close substitutes and can be used interchangeably.

**The Customers and Distribution Channels in the Relevant Markets**

69.     Hospital beds are typically purchased by individual hospitals who purchase beds for their facilities to care for admitted patients.

70.     Individual hospitals, however, typically do not negotiate directly with suppliers regarding contract terms for the purchase and sale of hospital beds. Instead, individual hospitals place purchase orders for hospital beds based on pricing agreements that have been negotiated with suppliers in advance through GPOs or IDNs, of which they are a part, that specify the product offerings and applicable terms.

71.     Importantly, these overarching pricing agreements negotiated by GPOs and IDNs do not constitute an agreement to purchase a specific quantity of hospital beds now or in the future. Instead, they merely set out the price and other terms for future purchases made by the customer during the effective period of the contract.

72.     Hospitals typically make large capital purchases of hospital beds only in certain circumstances or when their existing hospital beds reach the end of their useful life and trigger a replacement cycle. Outside of these large and irregular capital buys, hospitals typically buy hospital beds in small increments, and the decision to purchase beds is made at the individual hospital level based on that hospital's need to replace beds that are outdated or unrepairable.

**Group Purchasing Organizations**

73.     Group Purchasing Organizations ("GPOs") are important relationships for hospital bed suppliers. GPOs act as purchasing intermediaries that negotiate contracts between their customers—health care providers, such as hospitals—and suppliers of medical equipment and products. They serve as gatekeepers to screen suppliers and establish base-level pricing and contract terms.

74.     Hospitals join GPOs in order to outsource the contract negotiation process and gain access to the GPOs' negotiated agreements. An estimated 98% of U.S. hospitals use GPOs to help them with the procurement process, and these hospitals use an average of two to four GPOs per facility.

75.     GPOs vary in their organizational and ownership structures. For example, some GPOs have an ownership relationship with their customers (*e.g.*, the HealthTrust GPO and HCA), and some do not.

76.     There are only four major national GPOs: Vizient, Premier, HealthTrust, and

Intalere. Any vendor who wishes to sell products to hospitals and other health care providers must typically go through one of these four national GPOs in order to gain access to IDNs and their individual hospital members.

77.     The GPO industry now typically bids out and contracts for hospital equipment at the product level.

78.     The GPO contracting process generally includes several phases: the identification and selection of products to place on contract, requests for proposals or invitations for vendors to bid for contracts, review of submitted proposals and applications from vendors, clinical assessment of the quality of products that vendors propose by doctors and nurses, negotiation of contracts between hospital procurement officials and vendors, and finally contract award.

79.     The negotiation process also determines the contract administrative fee paid by the vendor to the GPO. GPOs are predominantly funded by administrative fees collected from vendors, which are almost always based on a percentage of the purchase price for products obtained through GPO contracts. Put another way, a supplier pays a fee to the GPO whenever a member hospital buys a product based on a pricing agreement the GPO negotiated with the supplier.

80.     According to the U.S. Government Accountability Office, the average administrative fee for a GPO contract is between 1.75% and 2%. However, there can be significant variation in the administrative fees paid by vendors, including vendors competing for or awarded a place on the same GPO contract for a given product.

81.     GPO members can make purchases under the pre-negotiated agreements during the time period that the agreement is in effect. Purchasing under a GPO-negotiated agreement

allows the hospital customer to avoid investing time and resources into evaluating and selecting among products or negotiating terms of purchase.

82.     It is important for suppliers in the hospital bed industry to be awarded GPO contracts because that gives them access to hospital systems and individual hospital customers. Conversely, a supplier that is not on a GPO contract is cut off from the vast majority of hospitals in the country. Exclusion from a GPO contract is particularly damaging where the supplier is new in the market or does not have a preexisting relationship with the customer.

83.     GPO contracts are referred to as "hunting licenses" by suppliers insofar as they only provide the supplier with the opportunity to sell to the GPO's members. GPOs do not actually purchase anything. Actual sales of product must be transacted directly with a hospital system or individual hospitals pursuant to the terms of the GPO contract.

**Integrated Delivery Networks**

84.     Integrated Delivery Networks ("IDNs") have become increasingly important to both customers and suppliers for the purchase and sale of hospital beds. An IDN, also referred to as a health system, is typically defined as an organization that owns or manages two or more hospitals along with other allied healthcare providers.

85.     Today, IDNs are the dominant institutional care model, and the IDN distribution channel is now the most significant and efficient channel for suppliers looking to sell medical equipment and other products to U.S. hospital systems and individual hospitals.

86.     There are at least 576 IDNs in the U.S. today.

87.     More than 80% of U.S. hospitals are affiliated with an IDN.

88.     More than 91% of hospital beds in the U.S. are affiliated with an IDN.

89.     There are no alternative distribution channels or outlets for competitors to sell medical equipment and other products to hospitals, let alone inferior or more expensive ones.

90.     The IDN distribution channel is highly concentrated. The top ten IDNs cover more than 1,175 hospitals and account for over 20% of all hospital beds in the U.S. They include large hospital systems such as Hospital Corporation of America ("HCA"), Kaiser Permanente, Common Spirit, Ascension, Providence, Tenet, and Trinity. HCA, the nation's largest IDN, owns hundreds of hospitals and over 2,000 sites of care in 20 states, and it boasts over 32 million annual patient encounters, recording over $50 billion in annual revenue in recent years.

91.     The growth of IDNs is significant because of the more centralized decision making that IDNs enable. Many decisions are being moved away from individual hospitals and into the matrix of issues and concerns addressed by IDNs at a systemic level. The result of this shift is that executives or administrators within IDNs can often be the decision-makers for all of their member hospitals.

92.     An IDN's common ownership and control also allows it to be far more capable than GPOs of driving contract compliance by forcing individual hospitals to purchase their requirements from the selected vendor and punishing any off-contract purchases. Because GPOs do not own hospitals or purchase any product themselves, they cannot promise any purchase volume to suppliers. But IDNs own member hospitals and can thus drive compliance and volume within a fiscal year.

93.     The end result is extremely high stakes for hospital bed suppliers when they are competing for contracts with the large, national, and increasingly consolidated IDNs. Just like being excluded from GPO contracts could seriously limit a supplier's ability to reach the

majority of U.S. hospitals, being unable to sell into a particular IDN can cut off a supplier from a significant portion of the market.

94.     The IDN contracting process is traditionally at the product level.

95.     The IDN contracting process is similar to the GPO contracting process, with a multi-phased procurement process that starts with a request for proposal ("RFP") and a clinical trial in which products are evaluated by doctors and nurses. If a product gains support during the clinical trial, the supplier may proceed to negotiation of an agreement with hospital administrators.

**Hill-Rom's Monopoly Power**

96.     Hill-Rom has monopoly power in each of the Relevant Markets.

97.     Hill-Rom's monopoly power is durable and has existed for decades.

98.     Hill-Rom maintains greater than 70% share of the installed base in each of the Relevant Markets.

99.     Hill-Rom has a demonstrated ability to control prices and exclude competition in the Relevant Markets.

100.     Hill-Rom's monopoly power is so strong that it has been able to drive change in customer contracting practices to its advantage.

101.     Hill-Rom's gross profit margins have increased steadily over the past decade, and the rate of increase in gross profit margins has accelerated in recent years.

102.     Hill-Rom has attributed its gross margin expansion to its ability to increase the prices Hill-Rom charges its customers. Indeed, when Hill-Rom announced yet another new record level gross margin, it told investors that the increase was particularly due to the higher

margin it was able to achieve on one-time purchases by customers struggling to deal with the COVID-19 pandemic.

103.    Over the past decade, there has not been a single significant competitor to enter the Relevant Markets.

104.    The inability of competitors to sustain sufficient sales in order to remain viable and relevant demonstrates that Hill-Rom's monopoly and exclusionary conduct has the effect of substantially lessening competition.

**Barriers to Entry in the Relevant Markets**

105.    Hill-Rom's monopoly power is protected by significant barriers to entry.

106.    Specifically, the myriad barriers to entry a potential new entrant faces include: (1) the significant capital investment required to enter the Relevant Markets, including the costs associated with acquiring significant economies of scope and scale; (2) Hill-Rom's entrenched monopoly and history of anticompetitive conduct; (3) Hill-Rom's longstanding relationships and exclusive dealing agreements with top IDNs; (4) Hill-Rom's patents and aggressive patent enforcement; and (5) the extensive nature of the regulatory regime applicable to medical equipment.

**Significant Capital Investment**

107.    The manufacture and sale of hospital beds is a capital-intensive business, which acts as a natural barrier to entry.

108.    New entrants must invest heavily in research and product development, which requires significant resources and increasingly expensive talent. All these costs must be incurred upfront. There are significant lead times for research and development, the process for

securing FDA compliance, and achieving learning curve economies.

109.   New entrants must also finance and develop their own manufacturing facilities and distribution networks at scale to ensure they can meet the demand of their customers. Without an existing customer base, prospective investment in such infrastructure is cost prohibitive. However, without the necessary infrastructure, new entrants cannot compete for large hospital purchase agreements because they lack the scale to timely fill purchase orders. This barrier to entry has become increasingly significant in recent years as consolidation in the health care industry has accelerated and individual customers have grown larger.

110.   New entrants must also create an extensive sales and service infrastructure that is necessary to serve the U.S. market. The large size of the U.S. market and wide geographic spread of hospitals throughout the U.S. require major capital investment to recruit sales and marketing talent, offer competitive compensation to retain employees, and put together a management structure to coordinate efforts and monitor performance and results.

111.   New entrants who are able to establish manufacturing facilities also face significant and rising input costs in the U.S. To manufacture hospital beds, new entrants need to purchase commodities such as aluminum and steel that are subject to significant volatility. Similarly, hospital bed manufacturing increasingly requires chips and sensors, which have been subject to shortages that have led to rising prices throughout the country.

**Hill-Rom's Entrenched Monopoly and History of Anticompetitive Conduct**

112.   New entrants also must confront the artificial barrier created by Hill-Rom's entrenched monopoly and reputation for brutal, anticompetitive tactics, which serves as a deterrent to new entrants and makes it more difficult for them to obtain the financing necessary to make the significant capital investments required.

20

113.    Hill-Rom's well-earned reputation for anticompetitive conduct has been the focus of numerous major antitrust lawsuits over the past two decades. These lawsuits alleged, among other things, that Hill-Rom employed illegal monopolization and exclusionary bundling practices to create, expand, and protect its market share. Indeed, they alleged that Hill-Rom used its dominant market share in the Standard Hospital Bed market as a lever to gain market power in adjacent markets and protect its existing monopoly power in the Standard Hospital Bed market.

114.    The first lawsuit was brought against Hill-Rom in 1995 by Kinetic Concepts, Inc. ("KCI"), a competitor in the manufacture and rental of specialty hospital beds, mattresses, and related medical devices. KCI alleged that Hill-Rom and its predecessor, Hillenbrand Industries, Inc. ("Hillenbrand"), leveraged their monopoly power in the Standard Hospital Bed market to gain control in a related medical equipment rental market through exclusionary bundling practices. Specifically, KCI alleged that Hill-Rom conditioned large discounts on sales of its manufactured Standard Hospital Beds and headwall units on a commitment by GPOs to rent specialty hospital beds from Hill-Rom exclusively for a period of five or more years. In September of 2002, a jury in the Western District of Texas returned a unanimous $173 million verdict in favor of KCI, finding that Hill-Rom had violated Section 2 of the Sherman Act. Hillenbrand eventually agreed to settle the case for $250 million. *See Kinetic Concepts., Inc. v. Hillenbrand Indus., Inc.*, 262 F. Supp. 2d 722 (W.D. Tex. 2003) [hereinafter ("*KCI*").

115.    Following the *KCI* verdict and settlement, a nationwide class of hospitals and health care providers led by Spartanburg Regional Healthcare System sued Hill-Rom and Hillenbrand in 2003 for damages arising from similar monopoly maintenance and anticompetitive actions. The plaintiff there was allowed to file a Second Amended Complaint.

*Spartanburg Reg'l Healthcare Sys. v. Hillebrand Indus., Inc.*, No. 7:03-2141-HFF-BHH, 2005

WL 8165816 (D.S.C. May 6, 2005). That complaint, which was filed after plaintiffs had

conducted discovery, alleged that Hill-Rom had implemented a "secret plan" for over a decade

that involved two main parts: first, Hill-Rom submitted RFP responses to GPOs and individual

hospitals that offered only "bundled" bids with "discounts" requiring customers to commit to

buying or renting 90% of their standard hospital beds, specialty beds, and other hospital

products from Hill-Rom. Second, Hill-Rom inflated its hospital bed prices to offset the

"discounts" it offered, rendering these discounts "illusory."  Hill-Rom thus "false[ly]"

represented that GPOs and hospital customers would "receive substantial discounts" if they

acquiesced to Hill-Rom's bundle, but in reality, hospitals were stuck paying supracompetitive

prices. The overall effect of Hill-Rom's conduct—per Hill-Rom's own customers—was fewer

competing suppliers, higher prices, and lower-quality hospital beds.

116.    Hill-Rom ultimately settled with Spartanburg for $337.5 million. *See* Settlement

Agreement, *Spartanburg Reg'l Healthcare Sys.*, 2005 WL 8165816, ECF No. 312-3. As part of

the settlement, Hill-Rom also agreed to an injunction that prevented Hill-Rom from leveraging

its monopoly power in the market for the sale of Standard Hospital Beds for three years. In

other words, the injunction forced Hill-Rom to unbundle and separately price and discount each

product.

117.    Upon the expiration of the *Spartanburg* injunction, Hill-Rom returned to its

anticompetitive ways. Universal Health Services ("UHS"), a competitor to Hill-Rom in the

rental industry and aspiring entrant into the Standard Hospital Bed market, sued Hill-Rom in

2015 for the same type of anticompetitive conduct it was accused of in the *KCI* and

*Spartanburg* actions. That complaint also survived a motion to dismiss. *Universal Hosp. Servs.,*

*Inc. v. Hill-Rom Holdings, Inc.*, No. SA-15-CA-32-FB, 2015 WL 6994438 (W.D. Tex. Oct. 15, 2015). UHS alleged that Hill-Rom improperly "leveraged" its monopoly in the Standard Hospital Bed market by negotiating long-term, difficult-to-terminate, sole-source agreements with GPOs—the six largest of which controlled an estimated 90% of all hospital medical equipment purchases and rentals—and related hospital associations. UHS alleged that these agreements conditioned steep discounts and rebates on the sale of standard beds on "ironclad" commitments to use Hill-Rom exclusively for their members' patient handling equipment ("PHE") and moveable medical equipment ("MME") rental needs. UHS alleged that the discounts offered by Hill-Rom dropped its price below cost. Furthermore, by bundling its standard bed monopoly with PHE and MME rentals, Hill-Rom foreclosed a substantial part of the market. The parties settled the case. *See* Stipulated Mot. for Dismissal With Prejudice, *Universal Hosp. Servs.*, 2015 WL 6994438, ECF No. 162. Hill-Rom publicly announced that it had agreed to divest certain moveable medical equipment from its third-party rental business to UHS, which generated revenue of $35 million per year.

118.    New entrants, even with pioneering products, also must therefore consider the possibility of contending with Hill-Rom's anticompetitive practices as they assess potential entry into the Relevant Markets.

**Hill-Rom's Longstanding Relationships and Exclusive Dealing Agreements with IDNs**

119.    Hill-Rom's long-term, exclusive dealing agreements with IDNs serve as an additional and critically important barrier to entry. As explained more fully below, these long-term, exclusive arrangements foreclose new entrants from competition and significantly narrow the portion of the market available to a new entrant, often leaving competitors free to feed only on the crumbs that fall from Hill-Rom's table.

120.     The highly concentrated nature of the IDN distribution channel, coupled with Hill-Rom's long-term, exclusive dealing agreements, exacerbates this barrier to entry.

121.     Without the ability to compete for the majority of customers, competitors cannot achieve the economies of scale necessary to effectively compete in the U.S. market. This, in turn, functions as an additional barrier to entry in the Relevant Markets.

**Hill-Rom's Patents and Aggressive Patent Enforcement**

122.     Intellectual property is another barrier with which new entrants must contend as they contemplate entering into the Hospital Bed market. Incumbents are very protective of the intellectual property and technology of their bed systems. And even if an incumbent does have a pioneering product, it must invest time and resources into protecting the pioneering features of its product by obtaining its own intellectual property rights.

123.     Hill-Rom has no fewer than 135 bed and bed-related products with hundreds of associated patents. Plus, Hill-Rom has patents for various bed-connected items, like surfaces that reduce pressure points, and connected information technology products, like WatchCare, designed to alert caregivers to incontinence. Hill-Rom's proprietary nurse call system, NaviCare, likewise has more than 55 patents. Hill-Rom has filed at least one patent associated with the connected NaviCare system that allows the smart beds to update within the network. This large number of patents means that it takes more time for competitors to innovate and find different ways to accomplish their objectives and features.

124.     Hill-Rom has a history of aggressively enforcing its patents. Even if an incumbent believes it has a truly unique product, there is always a risk that its rollout will get entangled in contentious litigation as Hill-Rom seeks to protect its market position. Patent lawsuits that tie up the rollout of key products have the potential to be major barriers and even a

death knell to potential entrants.

125.    Hill-Rom has repeatedly sued and threatened to sue competitors in the Relevant

Markets for violating their patents, often without basis.

126.    Hill-Rom's patents and its aggressive patent enforcement strategy serve to

protect Hill-Rom's installed base in the Relevant Markets by erecting barriers to entry for any

potential new entrants.

**The Regulatory Regime Applicable to Medical Equipment**

127.    The Relevant Products are all Class II medical devices subject to regulation by

the U.S. Food and Drug Administration ("FDA").

128.    New entrants must go through the arduous and costly process of registering their

products and obtaining compliance with rigorous FDA rules and regulations before they can sell

products in the Relevant Markets.

129.    After registration, the FDA has the authority to inspect production facilities

without notice and may issue warning letters or take other disciplinary action for non-

compliance, including shutting down the establishment. As such, hospital bed manufacturers in

the Relevant Markets must maintain certain records over time to substantiate compliance, and

the costs associated with such compliance efforts act as a further barrier to entry.

130.    Hospital bed manufacturers have also traditionally been subject to an excise tax

of 2.3% on medical devices. While this tax was suspended in 2016 and repealed in 2019, it was

in place from 2012 to 2016 and served as an additional barrier to entry to new entrants at that

time. The possibility that an excise tax may be revived serves as an additional barrier to entry

today.

**HILL-ROM'S ANTICOMPETITIVE CONDUCT IN THE RELEVANT MARKETS**

**The Advent of the "Corporate Enterprise Agreement"**

131.    The primary and most important prong of Hill-Rom's anticompetitive strategy was to impose Corporate Enterprise Agreements ("CEAs") upon IDNs to cover the Relevant Products. These CEAs were essentially the same type of agreement that customers condemned in the *Spartanburg* action but were then repurposed by Hill-Rom.

132.    The CEA strategy was the brainchild of incoming Hill-Rom CEO John Greisch ("Greisch"), who joined Hill-Rom from Baxter International in January 2010, and an ultra-aggressive new sales team that Hill-Rom created specifically to target IDNs and dispose of the threat posed by Linet.  As Greisch later explained to investors, Hill-Rom "redeployed some sales resources into what we call our enterprise sales group, which is a team focused on some of the larger systems," and this new, expanding team was charged with "leveraging the value of the breadth of our portfolio into the HCAs, the Ascensions, et cetera."

133.    At a J.P. Morgan Health Care Conference in January of 2013, Greisch foreshadowed this strategy when he explained to investors that "[o]ne of the real strengths of the company that we're trying to leverage and we'll continue to leverage going forward is the market position that we enjoy, we've got over 70% install base market share in the acute care [Standard Hospital Beds] market, tremendous brand name and very, very strong market presence and brand equity within the acute care and post-acute care markets here in the United States and overseas."

134.    Greisch recognized that Hill-Rom's market power created an enormous strategic lever that Hill-Rom could use to increase its market share in all of the Relevant Markets by offering customers anticompetitive deals that bundled the breadth of its portfolio in a way that

nobody else could match. In other words, while being careful not to say so directly, or to share any incriminating details, Greisch came to believe that Hill-Rom needed to recycle the very strategy that led to the *Spartanburg* settlement with its customers.

135.    Hill-Rom determined to entrench its monopoly by locking up IDNs with confidential, long-term, exclusive dealing agreements. This effort was led by Hill-Rom's Matt Crane, who acknowledges on LinkedIn that he "developed and validated new strategies to form enterprise accounts team" and led the "pilot to pursue IDNs under new structure and strategy." Crane worked closely with Hill-Rom's Bryan Risner, who likewise boasts on his LinkedIn page that he "pioneered the first IDN centric solution sales blueprint for the Strategic Partnerships team." Both worked in conjunction with senior Hill-Rom management.

136.    Hill-Rom targeted IDNs for this lock-up strategy because it recognized that they were increasingly able to influence customers' purchasing decisions even outside the context of any specific IDN and thus constituted the ideal pressure point to exert its leverage. Indeed, in public statements, Hill-Rom itself acknowledged that "IDNs and health systems often make key purchasing decisions and have influence over the GPO's contract decisions." This means that there is a synergistic or spillover effect, wherein Hill-Rom's foreclosure of IDNs would "spillover" and influence the contracting decisions of their GPOs, which in turn could lead to the foreclosure of independent hospitals, which were unaffiliated with any IDN but which bought under GPO contracts.

137.    Hill-Rom's anticompetitive strategy was straightforward. If it could lock up the top IDNs with exclusive agreements, Hill-Rom recognized that it would control all of their member hospitals as well. Many IDNs have centralized supply chain functions within the corporate parent entity. This structure provides Hill-Rom with a lever to drive contract

compliance to Hill-Rom's contractual exclusivity provisions, even if an individual hospital within an IDN would prefer to purchase competing products elsewhere at lower prices.

138.     The critical insight underlying Hill-Rom's strategy was thus to link all of an IDN's buying decisions together and offer substantial rebates in exchange for a confidential agreement to engage in long-term, exclusive dealing. By bundling all of an IDN's purchasing decisions together, Hill-Rom could take advantage of its installed base, the unique market dynamics outlined above, and its broad portfolio of products to avoid product-level competition.

139.     While GPOs and IDNs typically contract for products by category to avoid antitrust concerns, Hill-Rom recognized that it could not compete head-to-head on either price or quality at a product level. The CEAs were therefore designed to bundle and link together all of the purchasing decisions by hospitals within an IDN in numerous distinct product markets, including the Relevant Products, into a single overarching agreement with a collective rebate.

140.     Because this was a reincarnation of the same strategy that led its hospital customers to bring the *Spartanburg* litigation, Hill-Rom knew that it needed to disguise the true nature of the CEAs and conceal them from public scrutiny. For example, Hill-Rom knew it could not simply include all of the anticompetitive terms in a single agreement as it had done in *Spartanburg*, so instead it devised a contracting strategy in which its agreement with an IDN was made to look like multiple, independent product-level agreements, but which Hill-Rom secretly tied together using the CEAs as a strategic overlay. As a practical matter, they were still "one agreement" and the effect was the same as the agreements at issue in *Spartanburg*, but Hill-Rom believed that this contrived obfuscation would help insulate itself from liability. Thus, Hill-Rom conditioned exorbitant rebates across a broad portfolio of products (including the

Relevant Products) on an IDN's willingness to enter into long-term, exclusive dealing agreements.

141.    Hill-Rom assessed that, as a producer of multiple products, it could impose upon IDNs these secret, long-term exclusive dealing agreements by conditioning rebates on purchases across multiple different product lines that a "best of breed" producer in any single product category could not match.

142.    Hill-Rom initially targeted the largest health systems in the country, including the single largest IDN, HCA, and a series of other top IDNs, such as Providence Health, Universal Health Services, and Cleveland Clinic. Matt Crane, Hill-Rom's Vice-President in charge of Strategic and then Enterprise Accounts, led these efforts and "executed a plan to target" these specific IDNs and geographies.

143.    Hill-Rom's test-drive of its new anticompetitive campaign was successful.

144.    In 2014, Hill-Rom announced that it had entered into long-term, exclusive dealing agreements with one of the largest GPOs, HealthTrust, and two of the nation's largest hospital systems, HCA and Providence Health. In each of the IDN agreements, Hill-Rom was able to extract from the IDNs a long-term, exclusive dealing agreement to purchase all Standard Hospital Bed, ICU Bed, and Birthing Bed products from Hill-Rom for a duration of five or more years. For all practical purposes, these agreements are perpetual, however, and remain in effect today.

145.    The HCA deal came first. In June 2014, Hill-Rom publicly announced its exclusive dealing agreement with HCA, the nation's largest health system, as part of a comprehensive modernization program across the HCA system. While the announcement has now been scrubbed from Hill-Rom's website, and very few details were provided, Greisch later

reminded investors at a quarterly earnings conference that the HCA deal was "multi-year," covered "capital" purchases of the Relevant Products, and was "sole-source" with Hill-Rom. Greisch was careful, however, to avoid any mention of the fact that Hill-Rom had used a CEA to secure the deal.

146.    Three months later, in September of 2014, Hill-Rom publicly announced a stunningly long, exclusive dealing agreement with Providence Health ("Providence"), the nation's third largest not-for-profit health system, which lasted for seven years and included all of the Relevant Products. At the time, Providence was one of the largest health systems in the U.S., and Hill-Rom stated that it was "excited to transition to an exclusive partnership in a category as important as capital bed frames and surfaces." Once again, Hill-Rom failed to mention that it had used a CEA as a strategic overlay to secure the deal.

147.    The terms of both of these agreements were striking for their sharp departure from industry norms and customers' expressed preference for product-level competition. For example, while the average duration of most IDN agreements was one to three years, Hill-Rom was able to extend its hold over customers significantly further in these precedent-setting deals. Indeed, the Providence deal was more than double the length of any prior IDN deal and effectively locked up the nation's third-largest not-for-profit health system for nearly three-quarters of a decade.

148.    Hill-Rom viewed the HCA and Providence deals as a successful beta test and, indeed, both deals sent tremors throughout the U.S. hospital bed industry. For example, Greisch celebrated the boost that these agreements would provide to Hill-Rom and emphasized that Hill-Rom had a "high appetite" to continue to "really leverage the position we've got in the hospital systems." He explained that "how we leverage the position we have with our customers

30

on the back of the strength of our bed franchise is what excites us as we look forward." What he did not say, however, was how he was doing that. Greisch knew those details needed to be kept secret.

149.    The advent of the CEAs—and the covert resuscitation of the anticompetitive conduct that sparked the *Spartanburg* litigation brought by its customers—led to enormous returns for Hill-Rom. Indeed, Greisch boasted that 2014 was "one of the most successful years in our Company's history." This was despite the fact that he acknowledged two of Hill-Rom's most significant customers and largest IDNs in the country, HCA and Ascension, had reduced spending over the past year. Nonetheless, Greisch felt confident that those customers would be spending more capital on Hill-Rom product going forward, because "locking them in with the contracts that we've got, I feel very good about our position there."

150.    By the end of 2014, Greisch was so confident in his CEA strategy that he began predicting, ominously, that IDNs were going to want to deal with "fewer suppliers" going forward.

151.    Since its record-setting year in 2014, Hill-Rom has continued to execute on its anticompetitive strategy with other major IDNs. Indeed, by the end of 2016, Greisch told investors at a JPMorgan Healthcare Conference that Hill-Rom was now a "significant partner" with "every major IDN in North America," and admitted that it was still trying to "leverage" its portfolio with customers around the world because of the "stickiness" of its products. Once again, however, Greisch was careful to keep the details secret.

152.    As its CEA contracting strategy continued to lock up more and more of the market, Hill-Rom continued to expand its strategy and tout its success. Bryan Risner, Vice President of Enterprise Accounts, boasted on his public LinkedIn profile that Hill-Rom secured

"committed contracts for seven largest deals in history of company's business segments" via a "corporate agreement" between 2017 and 2019 that included "all contracted products with HCA," including rental offerings, smart beds and furniture, clinical IT solutions, and EMR connected vitals-sign devices. The deal's value, according to Risner, exceeded $500 million.

153. Similarly, in the first quarter of 2021, Hill-Rom's new CEO, John Groetelaars ("Groetelaars"), announced the "single largest deal that the company ha[d] ever done as part of one contract" with "one of the top three largest hospital systems in the country." Groetelaars explained that the deal encompassed a range of products, including NaviCare, Hill-Rom's mobile communications platform, and other integrated medical devices. Groetelaars, like Greisch before him, carefully avoided any discussion of how these deals were won.

154. Since the advent of its CEA strategy, moreover, Hill-Rom has consistently insisted on strict contract compliance and threatened IDNs with consequences if they do not accede to Hill-Rom's demands. Hill-Rom's sales force extensively monitors IDNs and, if it discovers that an IDN spoke with Hill-Rom's competitors, Hill-Rom resorts to intimidation and other tactics until the IDN agrees to cease all communications with competitors. If a hospital official complains about Hill-Rom's "strong-arming" tactics or being tired of opening up their checkbook and having Hill-Rom tell them what to write, they are quickly silenced. As a practical matter, IDNs have no choice but to accede to such bullying: once they sign a CEA, Hill-Rom has near-complete power and control over them.

**HILL-ROM'S CORPORATE ENTERPRISE AGREEMENTS ARE ANTICOMPETITIVE**

155. Hill-Rom's CEAs possess all the hallmarks of anticompetitive exclusive dealing agreements.

156.    Indeed, the CEAs are simply a different flavor of the same type of arrangement that Hill-Rom's customers challenged as anticompetitive in the *Spartanburg* litigation, with two significant modifications.

157.    First, the CEAs target IDNs, rather than GPOs, because Hill-Rom recognized that the IDNs increasingly control purchasing decisions and drive contract compliance.

158.    Second, Hill-Rom adopted a multi-contract strategy with separate product-level agreements connected together via the strategic overlay of the CEAs. Hill-Rom knew that coercing IDNs into a single agreement would be problematic in light of the *Spartanburg* litigation, so it chose this contracting strategy intentionally as a way to disguise the true nature of its long-term, exclusive dealing agreements with IDNs. As a practical matter, however, all of the agreements are connected together by the CEAs as part of "one agreement" and are thus essentially the same contractual structure as in *Spartanburg*.

159.    Hill-Rom has substantial market power in the Relevant Markets, with more than 70% installed base in each market. As described above, this installed base is "sticky" because of the unique dynamics of the Relevant Markets.

160.    The CEAs induce IDNs to agree to confidential, long-term, exclusive dealing agreements covering the Relevant Products that force IDNs to purchase all of their requirements from Hill-Rom or, alternatively, agree to an ironclad commitment to purchase a very high percentage—often exceeding 80-90%—of their requirements from Hill-Rom, which operate as *de facto* exclusive dealing agreements. As a practical matter, the effect on competition of an 80-90% commitment is tantamount to 100% because of the unique market dynamics of the Relevant Markets, including product standardization within a hospital.

161.    The predominant mechanism of exclusion in the CEAs is the exclusivity

provisions.

162.    Hill-Rom knew that the CEAs would strongly incentivize customers to achieve 100% commitment and that it could drive compliance by monitoring and pressuring IDNs to discipline their members accordingly.

163.    For all practical purposes, Hill-Rom's CEAs ensure that IDNs comply with the "committed" exclusive dealing contracts to purchase all or nearly all of their requirements for the Relevant Products from Hill-Rom through an overarching incentive and enforcement structure.

164.    The primary purpose of the CEAs is to obtain exclusive dealing agreements covering the Relevant Products and to maintain and strengthen Hill-Rom's monopoly position and eliminate competition. Because Hill-Rom is already a monopolist in the Relevant Markets, the exclusivity provisions are especially damaging to competition.

165.    The exclusivity provisions engendered by the CEAs are not justified by any legitimate economic or business rationale.

166.    Exclusive dealing agreements covering the Relevant Products do not provide IDNs or their member hospitals with any efficiency gains. All the benefits of the exclusive dealing agreement are in favor of Hill-Rom.

167.    The impetus for the exclusive dealing provisions in the CEAs was Hill-Rom. IDNs did not ask for Hill-Rom to impose exclusivity requirements and, but for Hill-Rom's conduct, would prefer not to "commit." Competition reliably results in lower prices and greater innovation, improving consumer welfare.

168.    As a practical matter, neither IDNs nor their member hospitals are free to walk

away from Hill-Rom's CEAs if another competitor offers a better price for the Relevant Products.

169.    Hill-Rom's agreements are made directly with the corporate parent entity of an IDN, which exerts ownership and control over individual hospitals within the IDN.

170.    Hill-Rom relies on the IDN corporate parent to drive contract compliance and require individual hospitals within the system to purchase Relevant Products from Hill-Rom. Hill-Rom assigns sales representatives from its Enterprise Accounts team to monitor IDNs and their member hospitals to ensure contract compliance. When Hill-Rom learns that an individual hospital may be interested in evaluating hospital bed products from another supplier, Hill-Rom informs the IDN corporate parent that it has committed to purchasing Hill-Rom products and that it is the IDN's obligation to ensure that hospitals within the system purchase Relevant Products from Hill-Rom.

171.    Hill-Rom's CEAs and exclusive dealing product agreements with IDNs bind member hospitals against their preference. As a result of this policing and enforcement system, individual hospitals within an IDN committed to Hill-Rom cannot give competitors a chance to demonstrate the value of their products, and thus Hill-Rom's competitors are excluded from any opportunity to make sales within an IDN that has exclusively committed its purchases to Hill-Rom on a long-term basis.

172.    In addition, the CEAs reinforce committed contracts by ensuring that an IDN cannot achieve its maximum rebate unless the hospitals within the system purchase effectively all of their requirements for the Relevant Products from Hill-Rom. Because the Relevant Products are the most expensive products in the bundle covered by the CEAs, Hill-Rom strategically sets the rebate levels under the CEAs so that the spend on the Relevant Products

contributes the greatest amount to a customer's rebate potential across the bundle. As a result, unless a customer agrees to purchase all or nearly all of its requirements for the Relevant Products from Hill-Rom, a customer would sacrifice CEA rebates on not just the Relevant Products, but also on other, unrelated products sold by Hill-Rom. Viewed another way, customers who choose not to adhere to the exclusivity provisions on the Relevant Products from Hill-Rom are faced with an across-the-board price increase on *all* products they buy from Hill-Rom.

173.    The conditional discounts and rebates offered by Hill-Rom are designed to leverage the breadth of Hill-Rom's portfolio of beds and other standalone pieces of equipment. As one analyst put it to Greisch at the Morgan Stanley Healthcare Conference in 2014, "I don't think any company in medical devices has more breadth than [Hill-Rom] without the depth." The CEAs thus ensure that it is impossible for any competitor in the Relevant Markets which does not manufacture a similarly broad line of products to demonstrate how offered savings could offset the rebate potential on other products with Hill-Rom. Indeed, the discounts and rebates are so steep that even a competitor offering its hospital beds for free would not be able to attract business away from Hill-Rom, considering the bundled package it offers. Thus, even equally (or more) efficient competitors are denied the opportunity to compete against Hill-Rom's bundled pricing scheme.

174.    The CEAs were structured and intended by Hill-Rom to be both long-term and nearly impossible to terminate.

175.    Hill-Rom's CEAs with IDNs are not merely substantially longer than typical GPO or IDN product-level agreements, but also effectively last in perpetuity and thus create long-term supply agreements with IDNs in the Relevant Markets—far longer in duration than is

necessary to accomplish a lawful purpose.

176.    Hill-Rom's CEAs are intended to significantly extend the standard industry term for product-level agreements by locking in IDNs to purchasing Hill-Rom products for five years or longer, which increases the customer's dependency and likelihood of renewal. In combination with the CEAs, long-term "committed" product agreements translate into a perpetual agreement because IDNs often stagger their purchases, the Relevant Products have a long useful life, and the unique market dynamics create massive switching costs. So long as the CEA remains in place, the customer's commitment is perpetual.

177.    Hill-Rom's IDN agreements are illogical but for their anticompetitive effect. Perpetual exclusive dealing agreements depress competition and do not have valid business justifications.

178.    If Hill-Rom were the provider of choice for a customer, it would not need to prevent that customer from buying from other suppliers through a contractual exclusivity provision because customers naturally prefer to standardize. The only reason for an exclusive dealing agreement is to lock up a customer that might prefer to buy one or more of the Relevant Products from other suppliers, so that standardization, switching costs, and entrenched brand preferences can take hold and create a lifelong customer not based on the merit of the products, but rather based on the coerciveness of the agreement. Indeed, the very fact that Hill-Rom as a monopolist needed to resort to long-term and exclusive CEAs is powerful evidence that Hill-Rom itself recognized that customers would otherwise prefer a competitor's products if given the choice.

179.    The CEAs, moreover, are even longer term in practical effect. These rebate agreements are generally renewed as a matter of course. Once an IDN is covered by a CEA and

commits to a purchase a significant percentage of its beds from Hill-Rom, it has a strong incentive to continue to purchase additional beds from Hill-Rom. The consequence of stepping back from a CEA would be an across-the-board price increase. Similarly, 70% of all U.S. hospitals' capital investment in hospital beds is tied up in Hill-Rom products that must continually be maintained and serviced in a timely manner in order to be usable and safe, so IDNs fear the consequences of angering Hill-Rom. Accordingly, once Hill-Rom secures a CEA with an IDN, it effectively means that IDN is closed to competition for at least the useful life of the beds purchased over the duration of the CEA, and likely far longer.

180.    Hill-Rom typically times the introduction and imposition of CEAs to when IDN customers are nearing a replacement cycle or purchasing a large volume of new beds to outfit newly expanded or acquired facilities. Because the product life of the Relevant Products is 10-15 years, if an IDN purchases bed products at the time it enters into the CEA, as is typically the case, the CEAs can potentially exclude rivals for at least 10 to 15 years or longer.

181.    IDN corporate parents create budgets for capital expenditures based on the prices listed in their agreement with Hill-Rom. The agreement's quoted prices depend on the IDN's compliance with the contract, including the exclusivity and minimum purchase requirements. The longer the duration of the agreement, the greater the dependency and reliance on the promise of future low prices. The potential financial penalties in terms of foregone savings create a powerful incentive for the IDN parent to force its individual hospitals to stick to the agreement with Hill-Rom. Meanwhile, Hill-Rom looks for ways to increase the price of its products above what is quoted in its customer agreements. Hill-Rom has been known to quote "de-featured" or bare bones beds to show a favorable price that entices hospital supply chain and procurement administrators to award the contract to Hill-Rom. But those beds lack the

functionality and technology needed at the clinical level; therefore, the price paid by the

hospital customers, like Plaintiff, forced to buy from Hill-Rom is often much higher due to

various options and add-ons that are required for patient care and provider safety.

182.    Moreover, Hill-Rom's high installed base, especially in IDNs where it has

secured exclusive agreements for purchase of Relevant Products, creates powerful effects that

render any termination provision in the agreement effectively meaningless.

183.    Hill-Rom's CEAs were unprecedented at the time that they were introduced by

Hill-Rom.

184.    There are no other competitors in the Relevant Markets that use CEAs the way

that Hill-Rom does.

185.    The effect of Hill-Rom's CEAs is to substantially lessen competition in the

Relevant Markets.

186.    There are no other significant distribution channels that would allow Hill-Rom's

competitors to sell to IDNs or their member hospitals once Hill-Rom has obtained exclusivity.

Merely securing GPO contracts is inadequate because those contracts are "hunting licenses"

and do not translate into sales to IDNs or individual hospitals. The importance of the IDN

distribution channel, moreover, is rapidly increasing as consolidation within the industry

accelerates.

187.    Hill-Rom knows the CEAs are anticompetitive and expose the company to

significant risk. As such, it recognized the need to disguise their nature and conceal them from

public scrutiny. For example, Hill-Rom knew it could not simply include all of the

anticompetitive terms in a single agreement as it had done in the *Spartanburg* litigation, so

instead it concocted a contracting strategy made up of multiple product-level agreements, tied

together by the CEA as a strategic overlay. As a practical matter, they were still "one agreement" and the effect was the same, but Hill-Rom believed that this contrived obfuscation would help insulate itself from liability.

188.    Hill-Rom also insisted on strict confidentiality clauses with its customers backed by contract provisions full of teeth in order to prevent IDN customers from revealing the existence, let alone the terms, of their CEAs with Hill-Rom. And although Hill-Rom repeatedly issued press releases and spoke openly about its customers wins, it has never once publicly acknowledged the existence of the CEAs.

189.    The intent of Hill-Rom's exclusive dealing agreements is to eliminate competition in the Relevant Markets by depriving customers of choice, locking them into buying only from Hill-Rom and locking out other competitors. The effect of Hill-Rom's anticompetitive conduct is to block smaller or potential competitors from competing for sales to the affected customers and deprive competitors of an opportunity to gain economies of scale by shutting off the largest customers, thereby resulting in higher prices paid by Plaintiff and other hospitals and inferior products available to the market as a whole.

## THE ANTICOMPETITIVE EFFECTS OF HILL-ROM'S CONDUCT

190.    Hill-Rom's anticompetitive conduct has caused and will continue to cause substantial harm to competition in the Relevant Markets in the United States.

191.    The primary purpose of the exclusivity provisions in Hill-Rom's CEA contracting strategy is to strengthen Hill-Rom's monopoly position and eliminate competition. Because Hill-Rom is already a monopolist in the Relevant Markets, the exclusivity provisions are especially damaging to competition.

192.    Hill-Rom's anticompetitive conduct results in supracompetitive prices to

hospitals like Plaintiff and other customers.

193.   Market evidence establishes that competition in the hospital bed industry drives down prices. In European markets, for example, the price of hospital beds is approximately 50-60% the price of beds in the U.S. If the Relevant Markets were competitive in the U.S., hospitals would likewise enjoy lower bed prices and better service.

194.   But for Hill-Rom's anticompetitive conduct, Plaintiff and other hospitals would have access to innovative and technologically superior products at lower prices.

195.   Hill-Rom's anticompetitive conduct has resulted in a significant decrease in service and quality in the Relevant Markets.

196.   Hill-Rom's anticompetitive acts and resulting foreclosure of the Relevant Markets affect prices and reduce quality for all hospitals. Hill-Rom's conduct therefore causes market-wide effects.

## CLASS ACTION ALLEGATIONS

197.   This action is brought as a class action pursuant to Fed. R. Civ. P. 23. The class definition is as follows:

> All direct purchasers of Standard Hospital Beds, ICU Beds, and/or Birthing Beds from Hill-Rom during a period beginning at least as early as June 20, 2020 and continuing until the unlawful effects of Hill-Rom's conduct alleged herein have ceased (the "Class Period").

198.   The Class is so numerous that joinder is impracticable. There are hundreds if not thousands of members of the proposed Class.

199.   There are questions of law and fact common to the Class.

200.   The named Plaintiff's claims are typical of the claims of the Class, in that all Class members share the same claim for overcharge damages and the same interest in

maximizing the amount of their overcharge damages.

201.    Plaintiff is represented by counsel experienced in the prosecution of complex antitrust class actions who will fairly and adequately protect the interests of the Class.

202.    Common questions of law and fact predominate over any questions affecting only individual Class members. Common questions include, but are not limited to:

a.   The proper boundaries of the relevant product and geographic markets;

b.   Whether Hill-Rom possesses market power in the relevant product and geographic markets, and whether such power can be proven directly (be showing anticompetitive effects) or indirectly (by establishing a dominant market share);

c.   Whether Hill-Rom's conduct challenged herein foreclosed a substantial share of the relevant product and geographic markets;

d.   Whether Hill-Rom's conduct challenged herein caused anticompetitive effects, whether those effects were offset by any legitimate procompetitive benefits, and whether the conduct challenged herein was the least restrictive alternative to achieve any legitimate procompetitive effects; and

e.   The proper method of measuring classwide damages.

203.    A class action is the superior method of adjudicating this controversy.

## CAUSES OF ACTION

## COUNT I

**Monopolization or Attempted Monopolization of the Standard Hospital Bed Market
In Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**

204.    Plaintiff realleges paragraphs 1–203 as set forth above.

205. The market for the sale of Standard Hospital Beds constitutes a relevant product market and the United States is the relevant geographic market.

206. Hill-Rom possesses monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the market for the sale of Standard Hospital Beds in the United States. Barriers to entry and barriers to expansion by existing firms are high in this market. Hill-Rom, with at least a 70% share of installed base in the Standard Hospital Bed market in the United States, has the power to control prices and exclude competition in the market.

207. Hill-Rom willfully and wrongfully obtained and/or maintained its monopoly power, or has willfully, knowingly, and with specific intent attempted to acquire that monopoly power, by engaging in the exclusionary, anticompetitive conduct set forth in the preceding paragraphs of this Class Action Complaint.

208. Hill-Rom acted with specific intent to monopolize the Standard Hospital Bed market.

209. Hill-Rom's long-term, exclusive dealing agreements in the Standard Hospital Bed Market are coercive, effectively perpetual, and nearly impossible to terminate.

210. The anticompetitive effects of Hill-Rom's conduct far outweigh any purported procompetitive justifications. Similarly, there are no legitimate business justifications for Hill-Rom's exclusionary conduct. To the extent that there are any legitimate business reasons for Hill-Rom's restraints of trade, they are not the least restrictive means of achieving those business purposes. Any claimed procompetitive business reasons for Hill-Rom's restraints of trade are outweighed by the competitive harm that they have caused, and will cause, to competition in the Standard Hospital Bed Market.

211.    Hill-Rom, through its exclusionary, anticompetitive conduct, has harmed

consumers and impaired competition by, without limitation, depriving IDNs, hospital systems,

and individual hospitals of choice, lower prices, and superior products and services, which

healthy and fair competition would have provided.

212.    Plaintiff and the Class members have been injured and will continue to be

injured in their businesses and property by paying more for Standard Hospital Beds than they

would have paid or would pay in the future in the absence of Hill-Rom's unlawful acts.

## COUNT II

### Monopolization or Attempted Monopolization of the ICU Bed Market
### In Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)

213.    Plaintiff realleges paragraphs 1–203 as set forth above.

214.    The market for the sale of ICU Beds constitutes a relevant product market and

the United States is the relevant geographic market.

215.    Hill-Rom possesses monopoly power, or at a minimum, a dangerous probability

of success in acquiring monopoly power, in the market for the sale of ICU Beds in the United

States. Barriers to entry and barriers to expansion by existing firms are high in this market. Hill-

Rom, with at least a 70% share of installed base in the ICU Bed market in the United States, has

the power to control prices and exclude competition in the market.

216.    Hill-Rom willfully and wrongfully obtained and/or maintained its monopoly

power, or has willfully, knowingly, and with specific intent attempted to acquire that monopoly

power, in the sale of ICU Beds by engaging in the exclusionary, anticompetitive conduct set

forth in the preceding paragraphs of this Complaint.

217.    Hill-Rom acted with specific intent to monopolize the Standard Hospital Bed

market.

218.    Hill-Rom's long-term, exclusive dealing agreements in the ICU Bed Market are coercive, effectively perpetual, and nearly impossible to terminate.

219.    The anticompetitive effects of Hill-Rom's conduct far outweigh any purported procompetitive justifications. Similarly, there are no legitimate business justifications for Hill-Rom's exclusionary conduct. To the extent that there are any legitimate business reasons for Hill-Rom's restraints of trade, they are not the least restrictive means of achieving those business purposes. Any claimed procompetitive business reasons for Hill-Rom's restraints of trade are outweighed by the competitive harm that they have caused, and will cause, to competition in the ICU Bed Market.

220.    Hill-Rom, through its exclusionary, anticompetitive conduct, has harmed consumers and impaired competition by, without limitation, depriving IDNs, hospital systems, and individual hospitals of choice, lower prices, and superior products and services, which healthy and fair competition would have provided.

221.    Plaintiff and the Class members have been injured and will continue to be injured in their businesses and property by paying more for ICU Beds than they would have paid or would pay in the future in the absence of Hill-Rom's unlawful acts.

## COUNT III

**Monopolization or Attempted Monopolization of the Birthing Bed Market
In Violation of Section 2 of the Sherman Act (15 U.S.C. § 2)**

222.    Plaintiff realleges paragraphs 1–203 as set forth above.

223.    The market for the sale of Birthing Beds constitutes a relevant product market and the United States is the relevant geographic market.

224.    Hill-Rom possesses monopoly power, or at a minimum, a dangerous probability of success in acquiring monopoly power, in the market for the sale of Birthing Beds in the United States. Barriers to entry and barriers to expansion by existing firms are high in this market. Hill-Rom, with at least a 70% share of installed base in the Birthing Bed market in the United States, has the power to control prices and exclude competition in the market.

225.    Hill-Rom willfully and wrongfully obtained and/or maintained its monopoly power, or has willfully, knowingly, and with specific intent attempted to acquire that monopoly power, in the sale of Birthing Beds by engaging in the exclusionary, anticompetitive conduct set forth in the preceding paragraphs of this Complaint.

226.    Hill-Rom acted with specific intent to monopolize the Birthing Bed market.

227.    Hill-Rom's long-term, exclusive dealing agreements in the Birthing Bed Market are coercive, effectively perpetual, and nearly impossible to terminate.

228.    The anticompetitive effects of Hill-Rom's conduct far outweigh any purported procompetitive justifications. Similarly, there are no legitimate business justifications for Hill-Rom's exclusionary conduct. To the extent that there are any legitimate business reasons for Hill-Rom's restraints of trade, they are not the least restrictive means of achieving those business purposes. Any claimed procompetitive business reasons for Hill-Rom's restraints of trade are outweighed by the competitive harm that they have caused, and will cause, to competition in the Birthing Bed Market.

229.    Hill-Rom, through its exclusionary, anticompetitive conduct, has harmed consumers and impaired competition by, without limitation, depriving IDNs, hospital systems, and individual hospitals of choice, lower prices, and superior products and services, which healthy and fair competition would have provided.

230.    Plaintiff and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Birthing Beds than they would have paid or would pay in the future in the absence of Hill-Rom's unlawful acts.

**COUNT IV**

**Unlawful Exclusive Dealing in Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**

231.    Plaintiff realleges paragraphs 1–203 as set forth above.

232.    Hill-Rom possessed (and currently possesses) market power in the Relevant Markets, including the markets for the sale of Standard Hospital Beds, ICU Beds, and Birthing Beds in the United States. In each of the Relevant Markets, Hill-Rom has the power to control prices and exclude competition.

233.    Hill-Rom has entered into exclusionary contracts with IDNs and Class members nationwide encompassing sales of Standard Hospital, ICU, and/or Birthing Beds, within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

234.    Hill-Rom has entered into exclusionary contracts with IDNs and Class members nationwide that explicitly or implicitly require member hospitals to purchase Standard Hospital, ICU, and/or Birthing Beds from Hill-Rom, and all of these agreements in total, have harmed competition in the Relevant Markets.

235.    Each of the challenged agreements has had, or is likely to have, substantial and unreasonable anticompetitive effects in the relevant market, including by depriving consumers of the benefits of free and open competition among manufacturers of Standard Hospital, ICU, and Birthing Beds (including lower prices, innovation, and service improvements).

236.    The procompetitive benefits, if any, associated with Hill-Rom's challenged contracts do not outweigh the actual and likely anticompetitive effects of these agreements.

237.   Hill-Rom's object, purpose, or intent in signing these agreements is to unlawfully restrain trade in the Relevant Markets.

238.   The conduct described herein unreasonably restrains trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

239.   Plaintiff and the Class members have been injured and will continue to be injured in their businesses and property by paying more for Standard Hospital Beds, ICU Beds, and Birthing Beds than they would have paid in the absence of Hill-Rom's unlawful acts.

**COUNT V**

**Unlawful Exclusive Dealing in Violation of Section 3 of the Clayton Act (15 U.S.C. § 14)**

240.   Plaintiff realleges paragraphs 1–203 as set forth above.

241.   Hill-Rom possessed (and currently possesses) market power in the Relevant Markets, including the market for the sale of Standard Hospital Beds, ICU Beds, and Birthing Beds in the United States. In each of the Relevant Markets, Hill-Rom has the power to control prices and exclude competition.

242.   Hill-Rom has entered into exclusionary contracts with IDNs and Class members nationwide encompassing sales of Standard Hospital, ICU, and/or Birthing Beds, within the meaning of Section 1 of the Sherman Act, 15 U.S.C. § 1.

243.   Hill-Rom has entered into exclusionary contracts with IDNs and Class members nationwide that explicitly or implicitly requires member hospitals to purchase Standard Hospital, ICU, and/or Birthing Beds from Hill-Rom, and all of these agreements in total, have harmed competition in the Relevant Markets.

244.   Each of the challenged agreements has had, or is likely to have, substantial and

unreasonable anticompetitive effects in the relevant market, including by depriving consumers

of the benefits of free and open competition among manufacturers of Standard Hospital, ICU,

and Birthing Beds (including lower prices, innovation, and service improvements).

245.    The procompetitive benefits, if any, associated with Hill-Rom's challenged

contracts do not outweigh the actual and likely anticompetitive effects of these agreements.

246.    Hill-Rom's object, purpose, or intent in signing these agreements is to

unlawfully restrain trade in the Relevant Markets.

247.    The conduct described herein unreasonably restrains trade and violates Section 3

of the Clayton Act, 15 U.S.C. § 14.

248.    Plaintiff and the Class members have been injured and will continue to be

injured in their businesses and property by paying more for Standard Hospital Beds, ICU Beds,

and Birthing Beds than they would have paid in the absence of Hill-Rom's unlawful acts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the proposed Class respectfully requests that the Court

adjudge and decree that:

A.  Hill-Rom engaged in unlawful acts in violation of Sections 1 and 2 of the Sherman Act and Sections 3 and 16 of the Clayton Act;

B.  Plaintiff and the proposed Class be awarded actual damages;

C.  Plaintiff and the proposed Class be awarded three-fold the damages (or the maximum amount of damages available under applicable law) that Plaintiff and the proposed Class are determined to have sustained pursuant to Section 4 of the Clayton Act;

D.  Plaintiff and the proposed Class be awarded pre- and post-judgment interest on any actual, treble, and/or other damages award;

E.  Plaintiff and the proposed Class recover costs of suit, including reasonable attorneys' fees and costs as provided by law;

F.   Hill-Rom be enjoined from continuing its anticompetitive conduct; and

G.   Plaintiff and the proposed Class be granted any other appropriate relief as may be determined to be just, equitable, and proper by this Court.

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED:   June 20, 2024

<div style="margin-left:45%">

Respectfully submitted,

*/s/ Katie R. Beran*
Katie R. Beran (PA Bar No. 313872)
Jeannine M. Kenney (PA Bar No. 307635)
HAUSFELD LLP
325 Chestnut Street, Suite 900
Philadelphia, PA 19106
Tel: (215) 985-3270
kberan@hausfeld.com
jkenney@hausfeld.com

Scott Martin
HAUSFELD LLP
33 Whitehall Street, 14th Floor
New York, NY 10004
Tel: (646) 357-1195
smartin@hausfeld.com
(*pro hac vice* forthcoming)

Gary I. Smith, Jr. (PA Bar No. 318152)
HAUSFELD LLP
600 Montgomery Street, Suite 3200
San Francisco, CA 94111
Tel: (267)-702-2318
gsmith@hausfeld.com

Michael P. Lehmann
HAUSFELD LLP
600 Montgomery St., Suite 3200
San Francisco, CA 94111
Tel: (267)-702-2318
mlehmann@@hausfeld.com
(*pro hac vice* forthcoming)

</div>

Arthur N. Bailey
RUPP PFALZGRAF, LLC
111 West 2nd Street, Suite 1100
Jamestown, NY 14701
Tel: (716) 664-2967
bailey@rupppfalzgraf.com
(*pro hac vice forthcoming*)

Gordon Ball
Jonathan Tanner Ball
GORDON BALL, PLLC
3728 West End Avenue
Nashville, TN 37205
Tel: (865) 525-7028
gball@gordonball.com
(*pro hac vice forthcoming*)


*Counsel for Plaintiff and the Proposed Class*